**In re The JULIEN COMPANY, Debtor.**

**Jack F. MARLOW, Trustee, Plaintiff,**

v.

**ROLLINS COTTON COMPANY, A DIVISION OF LOR, INC., Defendant/Third Party Plaintiff,**

v.

**BANKERS TRUST COMPANY and L & S Cotton Systems, Inc., Third Party Defendants.**

**Bankruptcy No. 90–20283–B (jmn).
Adv. No. 90–0104.**

United States Bankruptcy Court,
W.D. Tennessee, W.D.

May 3, 1991.

---

9. At that time the HEAL debt was some eight years old.

**606**

J. David Blaylock, Nan Barlow, Udelsohn, Blaylock & Marlow, P.C., Memphis, Tenn., for trustee.

John R. Dunlap, Thomas H. Fulton, Humphreys, Dunlap, Wellford, Acuff & Stanton, P.C., Memphis, Tenn., Jerome L. Kaplan, Allen I. Hirsch, Arnall, Golden & Gregory, Atlanta, Ga., for Rollins Cotton Co.

Saul C. Belz, Waring Cox, Memphis, Tenn., for L & S Cotton Systems, Inc.

William J. Landers, Martin, Tate, Morrow & Marston, Memphis, Tenn., for Bankers Trust Co.

MEMORANDUM OPINION AND ORDER ON ROLLINS' MOTION FOR SUMMARY JUDGMENT AND ON TRUSTEE'S MOTION TO STRIKE AFFIDAVIT

WILLIAM H. BROWN, Bankruptcy Judge.

In this adversary proceeding, the Chapter 11 Trustee seeks to avoid as preferential transfers payments made by the debtor to the defendant Rollins Cotton Company ("Rollins") in the amount of $22,028,569.52. Rollins answered and filed a third party complaint against Bankers Trust Company ("BTCo") and L & S Cotton Systems, Inc. ("L & S"). In the third party complaint, Rollins seeks judgment against BTCo and L & S to the extent Rollins is found liable to the Trustee. Rollins in its Third Count also sought punitive damages against the two third party defendants. L & S and BTCo have answered the third party complaint denying any liability to Rollins.

After the entry of an order of the United States District Court for this District denying a withdrawal of the reference to this Court, Rollins filed its motion for summary judgment as to all claims made against it by the Trustee, to which motion the Trustee has filed an objection. The Trustee also filed a motion to strike the affidavit of David L. Colby, which affidavit was submitted as a part of the motion for summary judgment. After oral arguments on February 28, 1991, and after consideration of all items related to the motions under advisement, the Court makes the following findings of fact and conclusions of law in accordance with Bankruptcy Rules 7052 and 7056.

### COLBY AFFIDAVIT

The affidavit of David L. Colby was submitted as a part of Rollins' motion for summary judgment, and the Trustee moves to strike that affidavit. Mr. Colby is Senior Vice President and General Manager of the Commercial and Agri–Business Divisions of Union Planters National Bank in Memphis, a position he has held for four years. For ten years, Mr. Colby has managed the cotton lending portfolios for Union Planters. Through his work with that bank, Mr. Colby became familiar with documents known as "trust receipts" and with how those documents are used in the cotton business. *See* Colby Affidavit.

The Trustee asserts that the affidavit fails to provide sufficient information to make Mr. Colby a competent witness on "financing transactions among cotton merchants." Trustee's Motion, ¶ 3. Federal Rule of Civil Procedure 56(e) provides that "affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify on the matters stated therein." Obviously, Mr. Colby's affidavit is submitted as testimony from an expert witness. Federal Rule of Evidence 702 allows a witness to be qualified as an expert by either "knowledge, skill, experience, training or education."

The affidavit sets out sufficient background information to satisfy this Court that from Mr. Colby's experience he is an expert in commodities financing and that he may so testify. The Trustee seems to question the extent of Mr. Colby's experience and that presents more an issue of the weight to be given the affidavit than an issue of its admissibility. *See, e.g., Loudermill v. Dow Chemical Co.*, 863 F.2d 566, 569 (8th Cir.1988); *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662–63 (11th Cir.1988). The Court concludes that the Colby affidavit is admissible.

■ The Trustee next asserts that the affiant's testimony concerning banking industry practice is irrelevant to transactions involving two cotton merchants. The same argument is made concerning testimony about the customary usage of cotton trust receipts. However, Mr. Colby related his experience to the two trust receipts at issue in this adversary proceeding and found the subject trust receipts to be substantially identical to the trust receipts utilized by his bank. One of the issues presented in this motion for summary judgment is whether the two subject trust receipts were properly completed or whether a mistake was made in the completion of the trust receipts. The Court concludes that because of the issues of ambiguity and mistake, the Colby affidavit as to customary and industry practice is relevant.

The Trustee objects to paragraph 7 of the affidavit as being speculation; however, the objection is more appropriately an argument as to the weight which should be given to Mr. Colby's opinion. Mr. Colby is essentially expressing an expert opinion that the party who completed the subject trust receipt forms made a mistake. That opinion is relevant and admissible. That is not to say that Mr. Colby's opinion erases all disputes of fact, which the Court will address later in this opinion.

■ The Trustee further asserts that the affidavit has no basis in fact as found in the record submitted with the motion for summary judgment. An expert may establish his opinion on facts which arguably have a basis in the record. *In re P & E*

*Boat Rentals, Inc.*, 872 F.2d 642, 654 (5th Cir.1989), *reh'g. denied*, 878 F.2d 1435 (1989). This Court finds that there is a basis in the record for Mr. Colby's assumed facts. *See* deposition of Donna Elzie and deposition of William Wirt Ludwick.

Finally, the Trustee contends that paragraph 11 of the affidavit states conclusions on the ultimate issue to be decided by this Court. Federal Rule of Evidence 704(a) provides that an expert's testimony is not inadmissible merely "because it embraces an ultimate issue to be decided by the trier of fact." This Court has considered Mr. Colby's affidavit and its opinions in the light of the facts otherwise presented in the record accompanying the motion for summary judgment, and the Court will decide the ultimate issues of fact and law after properly weighing Mr. Colby's opinions.

The motion to strike the affidavit of David L. Colby is denied.

## SUMMARY JUDGMENT

The Court must determine whether the defendant's motion for summary judgment may be granted as to the Trustee's claims. As to this motion, it is well settled that:

> [s]ummary judgment is properly granted when pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Rule 7056, Federal Rules of Bankruptcy Procedure. The Court must examine each issue in a light most favorable to the nonmoving party.

*In re Marlar*, 120 B.R. 51, 55 (Bankr.N.D. Miss.1989).

Moreover, the movant must demonstrate the basis on which it believes that summary judgment is justified. "The nonmoving party must then show that a genuine issue of material fact arises as to that issue." *Id* at 56. An issue is said to be "genuine" if "there is sufficient evidence favoring the nonmoving party for a factfinder to find for that party." *Id.*, citing

*Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265, 273 (5th Cir.1987), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 107 (1987). "A fact is material if it would 'affect the outcome of the lawsuit under the governing substantive law.'" *Id.*, citing *Phillips Oil Co.*, 812 F.2d at 272.

## SECTION 547(b)(5)

Rollins' motion for summary judgment rests upon its assertion that Rollins was a fully secured creditor at all times relevant to this proceeding and, as a result, the Trustee would be unable to satisfy one of the elements of a preference cause of action, specifically 11 U.S.C. § 547(b)(5). In order to establish a preference, § 547(g) mandates that the Trustee has the burden of proof to establish all elements under § 547(b) which provides:

> (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—
>
> > (1) to or for the benefit of a creditor;
> >
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> >
> > (3) made while the debtor was insolvent;
> >
> > (4) made—
>
> (A) on or within 90 days before the date of the filing of the petition; or
>
> (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
>
> > (5) that enables such creditor to receive more than such creditor would receive if—
>
> (A) the case were a case under chapter 7 of this title;
>
> (B) the transfer had not been made; and
>
> (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

Section 547(c) provides for defenses to a preference avoidance, if the Trustee proves all elements under § 547(b); however, those defenses are not an issue in the present motion.

## FINDINGS OF FACTS

From the pleadings, affidavits, depositions and answers to interrogatories, the following facts appear:

1. Rollins is a cotton merchant located in Montgomery, Alabama. Rollins is a division of LOR, Inc., a Georgia corporation. Stuart H. Frazier affidavit.

2. The founders of Rollins previously had eighteen years experience as cotton buyers. *Id.*

3. The Julien Company ("debtor") was a cotton merchant prior to the bankruptcy filing. Donna Elzie deposition at p. 16.

4. Jack F. Marlow, the plaintiff, is the duly appointed Chapter 11 Trustee for the debtor. Complaint.

5. Rollins engaged in buying cotton from farmers and selling it to mills. It is common in the cotton trade for cotton to be bought and sold by oral contract. Frazier affidavit; Elzie deposition at p. 18. In fact, oral contracts are standard in the industry. Elzie deposition at p. 18.

6. Commonly, contracts for cotton are forward contracts, with the price set in advance of the delivery date and based upon the cotton futures market. Frazier affidavit.

7. Cotton futures contracts are contracts to buy or sell cotton for future delivery. Trading of future contracts is carried out in cotton exchanges such as the New York Cotton Exchange, which is a recognized source for the market price for cotton futures. *Id.;* Elzie deposition at p. 34.

8. In addition to buying cotton from farmers, Rollins occasionally traded directly with other merchants such as the debtor. In these instances, the contract price would be based upon the cotton futures market, and the manner in which cotton is traded between merchants is governed by Southern Mill Rules which have been adopted and ratified by the American Textile Manufacturers Institute and the American Cotton Shippers Association. Frazier affidavit.

9. The United States Department of Agriculture publishes the *Daily Spot Cotton Quotations* which contains market

quotations which are relied upon by the cotton trade. *Id.*

10. In May, 1989, Rollins purchased certain certificated cotton, which is cotton that has been classed by the government as being tenderable on the New York futures market. More specifically, certificated cotton has been submitted to a delivery point where, under government supervision, it is analyzed to determine if it falls within the narrow range of grade, staple, and micronaire acceptable for delivery on New York Cotton Exchange futures contracts. *Id.;* *see also* Elzie deposition at pp. 77–80. Use of certificated cotton is an alternative to delivery of the physical cotton against a futures contract. Elzie deposition at p. 83.

11. Over several days, Rollins purchased May futures contracts under which Rollins eventually took delivery of warehouse receipts for 189,401 bales of cotton. Frazier affidavit.

12. Rollins sold some of these bales to Cargill, Inc. and to the debtor. In early June, 1989, the debtor contacted Rollins concerning the possible purchase of an additional 92,929 bales of certificated cotton from Rollins. *Id.*

13. Rollins decided to sell to the debtor, in part because Rollins was accruing carrying charges since May, 1989. If Rollins had not sold the cotton to someone and had retendered the cotton on the July New York futures contracts, Rollins would have sustained a loss. *Id.*

14. The debtor agreed to purchase the 92,929 bales for deferred delivery and at a price which would permit Rollins to break even on its original purchase. Until payment was received by Rollins, Rollins was to retain possession of the certificated warehouse receipts. *Id.* Rollins could also continue to attempt to market the cotton at a profit prior to delivery to the debtor. *Id.*

15. Rollins and the debtor arranged for delivery of 79,044 bales to two purchasers, and Rollins invoiced the debtor for these bales on July 3 and 18, 1989. *Id.;* *see* Exs. 1, 2 and 3 to Frazier affidavit.

16. Rollins received payment of its invoices on July 5 and 18, 1989. *Id.*

17. 13,885 bales of certificated cotton were delivered and sold to the debtor, which sale was invoiced on August 24, 1989. Payment was made to Rollins on August 28, 1989. *Id.;* *see* Ex. 4 to Frazier affidavit.

18. A summary of these transactions is provided in Mr. Frazier's affidavit, as follows:

| Ex. No. | Date of Invoice | Number of Bales | Amount | Date of Payment |
|---|---|---|---|---|
| 1 | 7/03/89 | 34,818 | $12,072,646.43 | 7/05/89 |
| 2 | 7/03/89 | 43,731 | $15,271,066.76 | 7/05/89 |
| 3 | 7/18/89 | 495 | $ 170,767.37 | 7/18/89 |
| 4 | 8/24/89 | 13,885 | $ 4,654,647.51 | 8/28/89 |

None of these transfers is the subject of the Trustee's complaint.

19. The debtor, through Julien Hohenberg, and Rollins, through Stuart Frazier, had previously negotiated what became an agreement that certificated cotton, which Rollins had taken delivery of in the May futures market, and which Rollins had sold to the debtor, would be carried to the July futures market, at which point the debtor would deliver the cotton against the July futures contract, and the profits would be split between the debtor and Rollins. *Id.,* pp. 88–89. Under this arrangement, when the debtor placed the cotton on the floor of the New York Cotton Exchange and it had been accepted by a buyer for delivery, Rollins would invoice the buyer for the cotton in the name of The Julien Company. After The Julien Company was paid, it would in turn pay Rollins. *Id.,* p. 90.

20. This agreement was memorialized in a memo dated June 27, 1989, from Julien J. Hohenberg to Stuart Frazier. Ex. 3, Elzie deposition.

21. This agreement was in essence a forward contract obligating the debtor to

take delivery of the Rollins' cotton at a future date. *Id.*, pp. 94–95; 158.

22. Exhibit 1 to the Elzie deposition reflects an invoicing by Rollins on July 5, 1989; however, some of that cotton was pulled off the market. Thus, only a portion of the cotton was paid for in July, 1989. Elzie deposition at pp. 95–98.

23. Exhibit 2 to the Elzie deposition represents a Rollins' invoice for cotton that could not be pulled off the market. *Id.*, p. 98. *See* Mrs. Elzie's interesting explanation of this invoice at pp. 99–102; *see also* Exhibit 6 which reflects the transfers found in Exhibit 2; *see,* pp. 111–112.

24. Exhibit 4 to the Elzie deposition represents a Rollins' invoice for 13,885 certificated bales, which invoice was paid. *Id.*, pp. 102–103.

25. In early July, 1989, after delivery of 79,044 bales, the debtor asked Rollins to repurchase approximately 65,000 bales of the certificated cotton, which the debtor had previously repurchased from its July futures contract buyers. Frazier affidavit.

26. Mr. Stuart H. Frazier met with Julien Hohenberg in Memphis and agreed that Rollins would finance the debtor's repurchase of the approximately 65,000 bales as that cotton was delivered to the debtor by commission houses. Both Rollins and the debtor would have an equal opportunity to merchandise this cotton for a profit, which profits would be split equally between these two parties. If the cotton could not be merchandised for a profit, the debtor would repay Rollins for the unsold cotton on or before the "first notice day" for October delivery on the New York futures contracts. The "first notice day" is defined as the first day that the owner of a short futures contract can provide notice of his intention to deliver cotton on the spot futures month, and "the first notice day" is generally five business days from the end of the month preceding the spot futures month. Frazier affidavit. Upon the "first notice day" one may deliver physical cotton against a futures contract. Elzie deposition at p. 30.

27. It was also agreed that Rollins would charge the prime rate of interest for its advance of funds and would be reimbursed by the debtor for Rollins' carrying charges on the repurchased cotton. Frazier affidavit; *see* Ex. 5 to Frazier affidavit.

28. Between July 6 and 27, 1989, approximately 65,000 bales of certificated cotton were repurchased by the debtor and paid for by Rollins for a total price of $21,570,611.77. Frazier affidavit; *see* Ex. 6 to Frazier affidavit.

29. As Rollins paid for the repurchased cotton, it took possession of the warehouse receipts for that cotton. *Id.*

30. In August, 1989, the debtor pursued its decision to decertificate and subsequently recertificate the repurchased cotton so as to remove overage penalties which accrued on bales of cotton which had been certificated four months or longer. Decertification requires notification of the proper cotton exchange that the cotton is to be removed from the certificated classification. The decertificated cotton may then be resubmitted for classification by the United States Department of Agriculture ("USDA"). If the USDA so certifies, then the bales are recertificated as tenderable on the New York futures contracts, and, as a result, all overage penalties are removed. The debtor represented to Rollins that this decertification/recertification procedure was less expensive than the accruing overage penalties. In order to accomplish its purpose, the debtor required possession of the certificated cotton warehouse receipts. *Id.; see also* Elzie deposition at pp. 80–82; 113–114. Timing was critical in this transaction. Elzie deposition at p. 116.

31. In August, 1989, the debtor requested that Rollins deliver the certificated warehouse receipts, and Rollins agreed provided that the debtor substituted other warehouse receipts of at least equal value. An agreement was reached between Billy Creswell of Rollins and Donna Elzie of the debtor that Rollins would be given seven to ten percent more replacement noncertificated receipts than certificated receipts being released so as to protect the value being surrendered by Rollins. Frazier affidavit; *see also* Elzie deposition at pp. 113–115.

32. The debtor caused L & S, the custodial agent for BTCo, (*see* ¶ 52, *infra*) to deliver to Rollins two trust receipts totalling 68,640 bales of noncertificated cotton warehouse receipts held by L & S. The trust receipts are dated August 15, 1989 (representing 32,200 bales) and August 23, 1989 (representing 36,440 bales). Frazier affidavit; *see* Elzie deposition at pp. 121–123; Exs. 7 and 8 to Elzie deposition; Ludwick deposition at pp. 53, 62. BTCo agreed to the giving of farmer's trust receipts to Rollins so that Rollins would surrender all of the certificated cotton receipts in return for segregation of the number of noncertificated bales represented by the farmer's trust receipts. When the Rollins' cotton had been recertificated and returned to Rollins, Rollins would in turn release the farmer's trust receipts, or Rollins could be paid for the recertificated cotton. Elzie deposition at pp. 118–131.

33. Rollins had retained possession of the warehouse receipts on the certificated cotton (*see* Ex. 5, Elzie deposition) and when Rollins received the trust receipts, Rollins released an appropriate number of certificated warehouse receipts to the debtor. Frazier affidavit; Elzie deposition at pp. 121–123.

34. The debtor was still obligated to pay Rollins for the recertificated cotton on or before the "first notice day" for October delivery on New York futures contracts. Frazier affidavit; Elzie deposition at p. 133. Payment was ultimately made to Rollins from the debtor's account at BTCo. Elzie deposition at p. 135.

35. Rollins and the debtor intended for L & S to segregate the warehouse receipts represented by the two trust receipts from other warehouse receipts held by L & S as collateral for BTCo or other creditors. Frazier affidavit. Upon the issuance of a farmer's trust receipt by L & S, L & S normally segregates that collateral or deducts it from the debtor's collateral held for BTCo. Mrs. Elzie saw the L & S documentation deducting 110% of the actual certificated bales from the noncertificated collateral. Elzie deposition at pp. 119–120.

36. In mid-September, 1989, the debtor requested that Rollins extend the agreed payment date, and Rollins consented. The certificated cotton which the debtor had either withdrawn from or replaced on the July market was still held by the debtor pursuant to the agreement with Rollins that extended until the October market the parties' understanding. Elzie deposition at pp. 106; 145–146. However, the further extension was still to be at the debtor's expense for Rollins' carrying costs. *Id.*, pp. 107–109; *see*, Ex. 5 to Elzie deposition. In other words, when the debtor paid for the cotton, the debtor was also obligated to pay Rollins' expenses of storing and carrying the cotton. *Id.*, pp. 109–110; 158. This type agreement is common in the cotton trade. *Id.*, pp. 108–109. On October 23, 1989, Rollins invoiced the debtor for $22,-028,569.52. *See* Ex. 7 to Frazier affidavit.

37. On October 24, 1989, the debtor wired $1,215,000.00 to Rollins, and on October 26, 1989, the debtor wired $20,813,-569.52 to Rollins. Frazier affidavit.; *see* Exs. 8 and 9 of Frazier affidavit.

38. On October 27, 1989, after receipt of the wire transfers, at the request of Mrs. Elzie, Rollins delivered the two farmer's trust receipts to the debtor by Federal Express. *Id.;* Elzie deposition at p. 136. Mrs. Elzie talked with Rollins, BTCo and L & S about Rollins' release of these trust receipts after payment. Elzie deposition at pp. 135–138, 163–164.

39. Exhibits 1 through 9 to the Frazier affidavit, referred to hereinabove, are copies of documents maintained in the ordinary course of Rollins' business activity. Frazier affidavit.

40. The applicable price for the earliest future contracts on the New York market were as follows:

| | | |
|---|---|---|
| On October 24, 1989 | (date of payment) | 73.38 cents per pound |
| On October 26, 1989 | (date of payment) | 74.18 cents per pound |
| On January 10, 1990 | (date of bankruptcy) | 65.48 cents per pound |

*Id., see* Exs. 10, 11, 12, Frazier affidavit.

41. A contract for forward delivery of cotton, pursuant to Rule 29 of the Southern Mill Rules, is based on a net weight of 500 pounds per bale. *Id., see* Ex. 13, Frazier affidavit.

42. Donna C. Elzie, a former employee of the debtor from July, 1986, until October 31, 1989, began there as a purchase clerk, with responsibility over drafts; however, she quickly assumed other responsibilities and reported to Julien Hohenberg. Elzie deposition at pp. 10, 13–16.

43. With the debtor's acquisition of Western Cotton Services, Mrs. Elzie's responsibilities increased. *Id.* at p. 16.

44. The futures market is used to hedge one's position. If one is long on physical possession and short on futures, that hedge provides some insurance on price. *Id.*, p. 19; *see also* Frazier affidavit.

45. A futures account is set up for the buying and selling of futures and the account holds the paper for the transfers made. *Id.*, p. 28.

46. "Basis" is the difference between the price actually paid versus the New York Cotton Exchange price at the time of purchase. Elzie deposition at p. 20.

47. The spot market represents cotton traded daily on the street. That market price fluctuates according to variables such as the availability of a specific quality of cotton. *Id.*, pp. 23–24.

48. Andrew Halle, Vice President of BTCo and the account manager for the debtor's account was not involved in the structuring of the Julien/Rollins deal; however, he was aware of it. Halle affidavit. In fact, Mr. Hohenberg had approached Mr. Halle about BTCo financing the cotton repurchase and BTCo had declined. Elzie deposition at p. 48.

49. Since May, 1988, BTCo held the operating account for the debtor, and BTCo saw all of the debtor's moneys go in and out. BTCo was the lead lending bank for the debtor. *Id.*, p. 53

50. Mr. Halle told Mrs. Elzie to pay Rollins in October, 1989. *Id.*, p. 49. The debtor had been running an over-line on its credit facility with BTCo since March 2, 1989. Therefore, the debtor could not pay Rollins without BTCo's approval. *Id.*, pp. 161–163.

51. Mr. David Colby at Union Planters National Bank, during the May to October, 1989 time frame, was engaged in financing some certificated cotton for the debtor and holding that cotton as collateral, but this was not the Rollins' cotton. *Id.*, pp. 51–52.

52. L & S was formed around May, 1988, as subcustodian for BTCo for the Julien Company's account. *Id.*, p. 63; William Wirt Ludwick deposition at pp. 12–13.

53. L & S was not controlled by the debtor. Elzie deposition at p. 64. Rather, L & S was controlled by BTCo, but the debtor paid for this service. *Id.*, pp. 65–66; Ludwick deposition at pp. 19–24. Exhibits 10 and 11 to the Ludwick deposition describe the relationship between L & S and BTCo. Ludwick deposition at p. 44.

54. William Wirt Ludwick of L & S was involved in maintaining an inventory of the debtor's collateral. Elzie deposition at p. 52. L & S had the responsibility of holding collateral of the debtor for BTCo. *Id.*, pp. 53–54. The collateral consisted of warehouse receipts and cotton equities. L & S's work involved tracking warehouse receipts in hand and in transit. Ludwick deposition at pp. 12–14.

55. L & S opened facilities in the Union Planters Bank Building. L & S's offices were contiguous to the debtor's facilities but L & S had separate entrances. *Id.*, pp. 25–26. The debtor had two employees who worked in the L & S offices pulling and filing warehouse receipts. *Id.*, p. 29.

56. The warehouse receipts were retained in a vault in L & S's offices. *Id.*

57. The debtor's employees delivered warehouse receipts to L & S, whose employees then maintained a physical count ledger, broken down by warehouse, of the receipts. *Id.*, pp. 30–31; Elzie deposition at pp. 69–70.

58. L & S reported daily to BTCo on the physical warehouse receipts it held as well as on receipts in transit. The daily collateral report form contained a place for listing of warehouse receipts on hand in the vault, of receipts held by other banks, of mill transit, of export transit, of trust receipts, of certificated bales, and of farmer's trust receipts. Ludwick deposition at p. 32. L & S also generated separate mill and port reports to account for cotton in transit. *Id.*, p. 34. L & S also maintained the debtor's inventory subject to trust receipts, evidencing, for example, inventory removed from L & S. Elzie deposition at p. 55. The debtor did not maintain a formal record, independent of L & S's records, of the number of warehouse receipts in the possession of L & S at a given time. *Id.*, p. 74. However, Mrs. Elzie did maintain records of the debtor's total collateral on her computer. *Id.*, p. 47.

59. L & S also maintained records of the debtor's cotton being held by other lenders. The expertise required by L & S was accounting ability to keep track of documents. Ludwick deposition at p. 18.

60. An internal trust receipt is "basically an inhouse tracking device." Elzie deposition at p. 59. It represents a trust receipt between the debtor and BTCo, which receipt is issued by L & S to indicate the location of cotton warehouse receipts not physically in the possession of L & S. *Id.* L & S is either to receive back cotton, money, or a transit letter to cancel such a trust receipt. The internal trust receipts were generated on a BTCo form by L & S. *Id.*, pp. 59–60.

61. The internal trust receipt usage also permitted the debtor to withdraw documentation from L & S, for example, for the purpose of making shipment. *Id.*, p. 128.

62. There is another form of trust receipt called a "farmer's trust receipt," which may be issued to evidence that cotton or warehouse receipts are in the possession of L & S but are held for some purpose. *Id.*, pp. 60–61. Such a trust receipt represents warehouse receipts, not specific bales of cotton. *Id.*, p. 127. It is a commitment that the number of bales stat-

ed in the trust receipt will always be available. *Id.*, p. 128.

63. The farmer's trust receipts were "a bastardized Union Planters farmer's trust receipt. It was used because typically ... farmers used the trust receipt [and] ... were accustomed to the format of Union Planters. So we basically took the 'UP' heading off and put on 'Bankers Trust.'" L & S could sign the farmer's trust receipts as agent for BTCo. BTCo on occasion signed a farmer's trust receipts at the request of a farmer. *Id.*, pp. 61–62, 126.

64. There is a dispute as to whether farmer's trust receipts are negotiable. *Id.*, p. 72; 152–153; *see* Exs. 7 and 8 to Elzie deposition. However, this dispute is not material to this motion because the two subject trust receipts were not negotiated.

65. In the cotton industry, a warehouse receipt, in contrast to these trust receipts, is a negotiable, bearer instrument representing ownership. Ludwick deposition at pp. 14–15.

66. Issuance of a farmer's trust receipt required BTCo's authorization to L & S. Mr. Andrew Halle of BTCo was aware that the farmer's trust receipts were to be issued in the Rollins' transaction and in what amounts. Elzie deposition at p. 119; Halle affidavit.

67. In the event the debtor failed to pay Rollins for the released certificated cotton, Rollins could take the two trust receipts to L & S and demand warehouse receipts for the bales represented on the two trust receipts. Elzie deposition at pp. 123–124. The L & S representative stated that L & S would not honor such a demand by Rollins without authorization from BTCo. Ludwick deposition at p. 113. No such demand was made by Rollins.

68. Mr. Ludwick stated that L & S never received warehouse receipts for certificated cotton from Rollins on behalf of the debtor. However, L & S did "prepare" and "sign" the two trust receipts and delivered them to the debtor. *Id.*, pp. 41–43. Mr. Ludwick identified the two farmer's trust receipts issued in reference the Rollins' cot-

ton as being signed by L & S. *Id.,* p. 53; *see,* Exs. 7 and 8, Elzie deposition.

69. Mr. Ludwick estimated that L & S signed no more than fifteen farmer's trust receipts. Ludwick deposition at p. 47.

70. L & S would customarily obtain the information for the farmer's trust receipts from an employee of the debtor, primarily Donna Elzie. *Id.,* p. 48.

71. On two occasions, both involving the Rollins' cotton, L & S contacted BTCo for authorization to execute a farmer's trust receipt. *Id.,* p. 50. This was done because Mr. Ludwick felt that the Rollins' transactions were "unusual" in that L & S was told to enter a number of bales on its records under certificated cotton and to offset that with the farmer's trust receipt when L & S did not physically have the certificated warehouse receipts. *Id.,* p. 51.

72. Donna Elzie's requests for L & S to issue the two farmer's trust receipts were made on the same dates shown on Exhibits 7 and 8 to the Elzie deposition. *Id.,* p. 63. Mr. Ludwick of L & S had no conversations concerning these receipts with representatives of Rollins on, before, or after the issuance of the two trust receipts. *Id.,* pp. 65–66.

73. Mr. Ludwick did have communications with Andrew Halle of BTCo concerning the two farmer's trust receipts. *Id.,* p. 69. Mr. Ludwick wrote to BTCo on August 15, 1989, and on August 23, 1989, requesting advice on whether to proceed with the debtor's request. L & S received authorization to proceed. *Id.,* pp. 72–78; *see* Exs. 14 and 15, Ludwick deposition; *see* also Halle affidavit.

74. Mr. Halle authorized the issuance of the two trust receipts and the deduction of the bales so represented from the bank's collateral pool. He assumed and directed that this should be a short term transaction. Mr. Halle stated that he never authorized the issuance of the two trust receipts without the receipt by L & S of the certificated warehouse receipts. Halle affidavit.

75. Mr. Ludwick stated that L & S, by its signature on the farmer's trust receipts, was not attesting to the existence of collateral represented by the farmer's trust receipts. *Id.,* pp. 34–37. However, simultaneously with the issuance of the two trust receipts, L & S segregated the required number of warehouse receipts on its books but not physically. Ludwick deposition at p. 79; 80–81. Exhibit 14, L & S's letter of August 15, 1989, to BTCo stated that the blocked warehouse receipts would be physically segregated; however that was not done. *Id.,* p. 100. The book segregation was intended to indicate that that number of warehouse receipts must be kept on hand to cover the trust receipts. *Id.,* pp. 79–80. At some future date, after payment to Rollins, L & S removed the block from its books, and until that point sufficient warehouse receipts were on hand to cover the block. *Id.,* pp. 81–82.

76. Mr. Ludwick stated that he had no knowledge that the two trust receipts were ever returned to L & S or BTCo. *Id.,* p. 82. However, BTCo called L & S and instructed L & S to remove the block. *Id.,* pp. 82–83.

77. L & S was aware that Rollins was involved in the trust receipt transaction, although Mr. Ludwick denied having knowledge of the extent of Rollins' interest in the warehouse receipts described in the two farmer's trust receipts. *Id.,* pp. 83–85.

78. The return of the two trust receipts was indicated as a deduction on L & S's collateral report. *Id.,* pp. 87–88. Also, L & S's collateral report number 315 reflects that on August 16, 1989, a deduction was made in the collateral corresponding to the August 15 farmer's trust receipts. *Id.,* pp. 92–93; *see,* Ex. 17 (p. 704558) to Ludwick deposition. The same is true as to collateral report number 322 as it relates to the two farmer's trust receipts as of August 25, 1989. *Id.,* pp. 93–94; *see,* Ex. 18 (p. 704175) to Ludwick deposition.

79. Page 704230 of Exhibit 18 shows, under "bales carried under trust receipt," an account receivable for the 68,640 bales blocked on account of the Rollins' trust receipts. *Id.,* pp. 94–95; Ex. 18.

80. Collateral report number 366 dated October 27, 1989, on page 703948 reflects the 68,640 bales still blocked. *Id.,* pp. 95–06; *see* Ex. 19 to Ludwick deposition.

81. Collateral report number 367 dated October 30, 1989, on page 703927, reflects that the 68,640 bales were now unblocked. *Id.*, p. 96; *see* Ex. 20 to Ludwick deposition.

82. The collateral reports were all maintained in the ordinary course of business of L & S. *Id.*, pp. 93, 95, 96, 97.

83. Collateral report number 315 at page 704558 reflects 32,200 certificated bales, although L & S did not actually receive the warehouse receipts for the certificated cotton. *Id.*, p. 98; *see* Ex. 17.

84. Exhibit 18, at page 704175, reflects 68,640 certificated bales as a result of the request from Donna Elzie and authorization from BTCo. Again, L & S did not actually receive the warehouse receipts for the certificated cotton. *Id.*, pp. 99–100.

85. The certificated cotton was reflected on Exhibits 17 and 18 (at pages 704558 and 704175) as being "in transit," in accordance with the instruction of Donna Elzie and confirmation by BTCo. *Id.*, pp. 109–112.

## CONCLUSIONS OF LAW

██ Under § 547(b)(5) a comparison must be made between what the defendant creditor actually received and what it would receive in a hypothetical Chapter 7 distribution. The trustee must prove that the creditor actually received more in the suspect transfer than it would have received in a Chapter 7 liquidation, assuming the suspect transfer had not been made. 2 *Norton Bankruptcy Law and Practice*, § 32.09 (1990). The hypothetical Chapter 7 analysis is made as of the date of the bankruptcy filing. *In re Royal Golf Products Corp.*, 908 F.2d 91 (6th Cir.1990); *In re Tenna Corp.*, 801 F.2d 819 (6th Cir. 1986). Section 547(b)(5) most commonly affects transfers to unsecured creditors. *See, e.g., In re Lewis W. Shurtleff, Inc.*, 778 F.2d 1416, 1421 (9th Cir.1985). If a creditor is properly secured and a transfer is made to that creditor, prior to the bankruptcy and in satisfaction of the creditor's lien, to the extent that the transfer does not exceed the value of the creditor's lien, the creditor's position is not improved by the transfer and no preferential effect results. *See, e.g., Palmer Clay Products Co. v. Brown*, 297 U.S. 227, 56 S.Ct. 450, 80 L.Ed. 655 (1936); *see generally*, 2 *Norton Bankruptcy Law and Practice*, § 32.09. Generally speaking, "payment to a fully secured creditor does not diminish the value of the [debtor's] estate since, while cash is removed from the estate, the secured party's lien is reduced in equal amount. This same conclusion can be reached concerning any payment to the extent that it discharges a preexisting, valid lien that would be fully satisfied in bankruptcy." 2 *Norton Bankruptcy Law and Practice*, § 32.09 at p. 35; *see also, In re Prescott*, 805 F.2d 719, 726 (7th Cir.1986); *In re Missionary Baptist Foundation of America, Inc.*, 796 F.2d 752, 759 (5th Cir.1986). In summary, if the debtor's estate is not depleted, there may in fact have been no preferential transfer. *See, e.g., In re Pitman*, 843 F.2d 235, 241 (6th Cir.1988).

The primary issue presented in this motion is whether Rollins was a secured creditor at the time of the two questioned transfers to Rollins. Further, if Rollins was secured, it must be determined whether it was a fully secured creditor or whether the transfers exceeded the value of the security held by or for Rollins. *See, e.g., In re Property Leasing & Management, Inc.*, 46 B.R. 903, 911 (Bankr.E.D.Tenn.1985). A resolution of this issue requires a practical examination of the relevant facts, and the Court finds that there are no genuine disputes over material facts. Thus, the motion presents issues which are ripe for summary judgment.

██ The nature of the transactions between the debtor and Rollins is complex. In substance, the debtor had purchased certain certificated cotton from Rollins. However, the debtor requested that Rollins either repurchase, or finance the debtor's repurchase of, approximately 65,000 bales of the certificated cotton, and Rollins took possession of the negotiable warehouse receipts for those 65,000 bales as Rollins paid for them. This was in July, 1989, and at that point the parties had agreed that if the cotton could be sold at a profit before the first notice day in October, it would be sold.

Rollins, in that event, would have been paid in full, including its carrying charges, and the profit, if any, would have been split between the parties. However, if the cotton was not sold to a third party, the debtor was obligated to pay Rollins for the cotton on or before the first notice day in October, in which event the transaction would in effect be an extension of financing by Rollins, and Rollins would still be entitled to its carrying costs. Rollins held the negotiable certificated warehouse receipts either as an owner or as a secured creditor, depending upon the ultimate nature of the transaction.

After this agreement had been reached, the debtor, for its own reasons, determined that it would have the cotton decertificated so as to eliminate overage penalties which were accruing. This required that the debtor obtain physical possession of the warehouse receipts from Rollins. Since the debtor was not paying Rollins at that point in time, the parties agreed that Rollins would be given substitute noncertificated warehouse receipts in a sufficient number to secure Rollins' debt. Rollins was then giving up its original security and receiving replacement security.

Had this transaction been limited to the debtor and Rollins, there would be no question that Rollins was a secured creditor under Tennessee Code Annotated § 47–9–305 which provides:

**47–9–305. When possession by secured party perfects security interest without filing.**—A security interest in letters of credit and advices of credit (subsection (2)(a) of § 47–5–116), goods, instruments (other than certificated securities), negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this

chapter. The security interest may be otherwise perfected as provided in this chapter before or after the period of possession by the secured party.

Tennessee law controls this transaction pursuant to Tennessee Code Annotated 47–9–103(1)(b), which provides:

**47–9–103. Perfection of security interests in multiple state transactions.—**

(1) DOCUMENTS, INSTRUMENTS AND ORDINARY GOODS.

(b) Except as otherwise provided in this subsection, perfection and the effect of perfection or nonperfection of a security interest in collateral are governed by the law of the jurisdiction where the collateral is when the last event occurs on which is based the assertion that the security interest is perfected or unperfected.

The substitution collateral, consisting of noncertificated warehouse receipts, was in the physical possession of L & S in Memphis, Tennessee. It was this substitution collateral which is asserted by the Trustee to not properly be collateral for Rollins' debt.

The transaction ended up as a financing arrangement when the debtor could not pay Rollins but needed possession of the certificated warehouse receipts. Clearly, Rollins was holding those certificated warehouse receipts as collateral for its extension of financing to the debtor. Had the debtor simply paid Rollins and obtained a release of the certificated warehouse receipts, there would have been no depletion of the debtor's estate and no preferential transfer. Instead, the debtor asked Rollins to relinquish the certificated warehouse receipts before being paid. Upon the relinquishment of the original collateral, Rollins and the debtor intended that Rollins contemporaneously receive trust receipts for a sufficient number of noncertificated warehouse receipts so as to continue to secure Rollins' full debt. At this point, the two parties understood that the debtor owed Rollins a debt, payable at a specific future date. As between Rollins and the debtor, Rollins was still a fully secured creditor

with a perfected security interest in the substitution collateral.

■ The difficulty with analysis of these facts is presented by the presence and actions of L & S and BTCo. L & S was the subcustodian of the debtor's collateral, with L & S acting on behalf of BTCo, the debtor's primary lender. The facts do not support that the debtor controlled L & S, although the debtor worked closely with L & S and paid for the services provided by L & S. Rather, L & S was clearly controlled by BTCo as evidenced by the written agreements between L & S and BTCo (Exs. 10 & 11, Ludwick deposition) and by the fact that Mr. Ludwick of L & S relied upon BTCo's instructions as to the Rollins' transactions.

L & S was a bailee of the debtor's collateral, holding numerous negotiable warehouse receipts for cotton. *See* Tennessee Code Annotated §§ 47–1–201(15) and 47–7–104. The proof demonstrates that L & S on occasion released warehouse receipts to the debtor, which receipts were shown as being "in transit" while the debtor did what was necessary to transfer those warehouse receipts to ultimate buyers. In other words, there was a trustful relationship between the debtor and L & S. L & S was accustomed to receiving requests from the debtor and acting thereon. If L & S questioned the debtor's request, as in the Rollins' scenario, L & S contacted BTCo for instructions.

The Trustee disputes that L & S held the noncertificated warehouse receipts subject to Rollins' security interest. The facts do establish that Rollins released the certificated warehouse receipts to the debtor rather than to L & S. However, the certificated receipts were reflected in L & S's records as being "in transit," and this was not only in compliance with the instruction from Donna Elzie of the debtor but in compliance with BTCo's confirmation of Mrs. Elzie's instructions. Ludwick deposition at pp. 109–112; *see* Exs. 17 and 18 to Ludwick deposition. Furthermore, it was the debtor which needed possession of the certificated warehouse receipts in order to accomplish the decertification/recertifica-

tion procedure. Had the receipts been delivered to L & S, L & S would have been required to immediately deliver them to the debtor so as to permit the decertification/recertification. While L & S did not actually receive physical possession of the certificated warehouse receipts, it had de facto custodial control over those receipts as reflected in its records and by the course of dealing between L & S, the debtor and BTCo. Moreover, L & S acknowledged its custodial control of the certificated warehouse receipts by its execution of the two farmer's trust receipt forms which stated that Rollins had delivered to L & S the warehouse receipts. The trust receipt forms provided that the debtor could withdraw documents. *See* Exs. 7 & 8, Elzie deposition. The actual delivery of the warehouse receipts to the debtor instead of to L & S does not defeat the de facto control which L & S exercised over the debtor's collateral. There was a constructive delivery to L & S. This conclusion is supported by the fact that L & S's records reflected an entry of the certificated cotton contemporaneously with the offsetting farmer's trust receipts. L & S specifically obtained authority from BTCo to issue the two farmer's trust receipts, and L & S obviously knew that it had not actually received the certificated warehouse receipts for the 65,000 bales. In fact, the reason Mr. Ludwick of L & S asked Mr. Halle of BTCo for direction is that L & S had not received the certificated receipts. *See*, ¶ 71, Findings of Fact, *supra*. Even though Mr. Halle stated that he assumed that L & S would actually receive the certificated warehouse receipts, BTCo is bound by the knowledge of its agent and subcustodian L & S, which obviously knew that it was not receiving the certificated receipts. *See* Ludwick deposition at pp. 50–51, 98–100.

The Trustee argues that L & S failed to physically segregate Rollins' collateral as L & S stated it had done in the trust receipts. However, this is form over substance. The facts are undisputed that the records of L & S consistently reflected a blocking of the required number of noncertificated warehouse receipts from the time of issuance of

the two farmer's trust receipts until October 30, 1989, a date after Rollins had been paid by the debtor and after Rollins had released the two trust receipts. In fact, L & S told BTCo that it would physically segregate the Rollins collateral. Ex. 14, Ludwick deposition. A paper segregation rather than physical segregation was carried out. All of this paper segregation on the books of L & S was done with the full knowledge and consent of both the debtor and BTCo. The effect of L & S's activity was to segregate warehouse receipts for 68,640 bales of noncertificated cotton to secure Rollins. L & S maintained that number of bales in a blocked fashion so as to keep that number of bales from being depleted.

There is some proof in Mr. Colby's affidavit that the two farmer's trust receipts were improperly and mistakenly completed and that they should have read as follows:

> This is to certify that [The Julien Company, in care of L & S Cotton Systems] has delivered to the undersigned [L & S Cotton Systems], for the account of [Rollins Cotton] warehouse receipts and/or compress receipts and/or negotiable bills of lading calling for [number of] bales of cotton of various marks.

Mr. Colby, however, was of the opinion, and this Court agrees, that any errors in completion of the two trust receipts do not affect their validity. The reality is that L & S issued the two trust receipts for the purpose of indicating a blocking of noncertificated warehouse receipts for the benefit of Rollins, and L & S's total actions support that conclusion.

■ L & S was not controlled by the debtor nor by Rollins and could act as a bailee for Rollins. *See, e.g., In re Reddington/Sunstar, Ltd.,* 100 B.R. 1, 4 (Bankr.D. Ariz.1988) (applying Tennessee law and stating that UCC 9–305 permitted a party not under the "sole dominion and control of the secured party" to act as a bailee. *Quoting In re Copeland,* 531 F.2d 1195, 1204, 18 UCC Rep. 833, 843 (3rd Cir.1976)). No particular form is mandated by Tennessee Code Annotated § 47–9–305 for the creation of a bailment. The two letters from

L & S to BTCo (Exs. 14 & 15, Ludwick deposition) coupled with the issuance of the two trust receipts (Exs. 7 & 8, Elzie deposition) acknowledge the bailee role of L & S toward Rollins. The Court finds from all of the facts and circumstances that an actual bailment did exist. *See, e.g., In re Terry,* 56 B.R. 713, 715 (Bankr.W.D.N.Y. 1986). However, at the very least, a constructive bailment would "arise where a person having possession of a chattel holds it under such circumstances that an obligation to deliver it to another is imposed by law." *In re Crabtree,* 48 B.R. 528, 532 (Bankr.E.D.Tenn.1985). Under all of the facts and circumstances, the Court finds a constructive delivery to L & S, and an acceptance of accountability by L & S, of the certificated receipts, and the Court finds that L & S held the noncertificated receipts as bailee for Rollins.

The Trustee also argues that L & S, as a bailee, did not have knowledge of Rollins' security interest, but knowledge of the exact nature of Rollins' interest is not required by the language of Tennessee Code Annotated § 47–9–305. Clearly, L & S had notice that Rollins was asserting an interest in the blocked warehouse receipts. L & S acknowledged that by L & S's execution of the two trust receipts. L & S certainly knew, at that point, that Rollins claimed some interest in the noncertificated warehouse receipts represented by the two farmer's trust receipts. There would be no other reason for the issuance of the two trust receipts nor for L & S's paper segregation or blocking of the noncertificated warehouse receipts identified in the two trust receipts. Not only was L & S engaged in blocking the noncertificated warehouse receipts so as to assure that the number was maintained while the trust receipts were outstanding, BTCo was also aware of and authorized L & S's actions in deducting the blocked receipts from BTCo's collateral pool. Furthermore, by the very nature of L & S's responsibilities under its written agreement with BTCo, L & S knew that it was holding collateral for secured lenders. *See* Exs. 10 & 11, Ludwick deposition. Section 47–9–305 only requires that the bailee know of the secured party's in-

terest, and L & S's actions in blocking the collateral on its records belie L & S's assertions. There is no genuine dispute as to the effect of L & S's actions or L & S's knowledge of Rollins' interest. *See, e.g.,* Ludwick deposition at pp. 84–86.

The Court should not read and apply § 47–9–305 in this case so strictly as to cause unjust results. *In re Ault,* 6 B.R. 58, 68 (Bankr.E.D.Tenn.1980). Perfection of security interests by possession of a bailee is intended to provide notice to "prospective creditors that the [debtor's] ownership rights may be restricted or encumbered." *In re Crabtree,* 48 B.R. at 532; *see also, In re King,* 10 B.R. 685, 686–87 (Bankr.E.D.Tenn.1981). Clearly, L & S notified BTCo that the blocked receipts were subject to Rollins' interest, and L & S admitted that the blocked number of receipts must be maintained in order to cover the two trust receipts held by Rollins. Ludwick deposition at pp. 79–81, 95, 101. There is nothing to indicate that L & S would not have similarly notified any other potential creditor of the blocked collateral. Moreover, L & S wrote two letters, on August 15 and 23, 1989, to Mr. Halle at BTCo, which letters refer to the trust receipts procedure and to Rollins' certificated cotton. *See* Exs. 15 and 16, Ludwick deposition. BTCo approved L & S's actions. *See* Ex. 14, Ludwick deposition. Mr. Halle of BTCo had been in communication with Mrs. Elzie of the debtor. *See, e.g.,* Elzie deposition at p. 118. Mr. Halle obviously understood the entire transaction, and he approved the debtor's payment of $22,028,-569.52 to Rollins, upon receipt of which Rollins released the two trust receipts. L & S's records reflect that release of Rollins' collateral, although the trust receipts were returned to the debtor rather than to L & S. L & S unblocked the 68,640 bales of noncertificated cotton, returning those bales to the collateral pool held for BTCo or other secured creditors.

There has been no proof offered that the debtor's collateral account at L & S suffered from this transaction nor has there been any proof offered that the debtor's estate was diminished by the Rollins' transaction. The debtor received the warehouse receipts for the certificated cotton for which Rollins received the agreed upon substitution collateral. Rollins released its security interest in the substituted collateral, the noncertificated warehouse receipts, contemporaneously with payment. The debtor's estate made a significant payment to Rollins but received in return consideration it had bargained for. As to the substitution collateral, the proof reflected that the noncertificated cotton had a market value higher than Rollins' debt. *See,* ¶ 40 and 41, Findings of Fact, *supra.* Therefore, Rollins was a fully secured creditor throughout these financing transactions, including on the date of the bankruptcy filing. As of January 10, 1990, the date of the original involuntary filing, the Frazier affidavit establishes the value of a bale of cotton at $327.40. Multiplying that number by the 68,640 bales held in trust by L & S yields a value of $22,472,736.00. Rollins was paid $22,028,569.52. The wire transfer payments to Rollins merely satisfied Rollins' secured debt in full and Rollins received no more than it would have received had its lien been satisfied in a Chapter 7 distribution.

There is no genuine issue as to any material facts. There are only legal issues as to the conclusions to be drawn from the established material facts. The Court concludes that Rollins is entitled to a judgment as a matter of law, it having been factually established that Rollins was a fully secured creditor when it received the subject transfers from the debtor.

THEREFORE, IT IS ORDERED:

1. Summary judgment is granted in favor of the defendant Rollins, and the Trustee's relief for avoidance of preferential transfers is denied.

2. After this Order becomes final, the Court will expect Rollins to inform the Court if it intends to proceed with its third party complaints against L & S and BTCo.

SO ORDERED.