In re The JULIEN COMPANY, Debtor.

Jack F. MARLOW, Trustee for The Julien Company, Plaintiff and Counterdefendant,

v.

OAKLAND GIN COMPANY, INC., Defendant and Counterclaimant.

Bankruptcy No. 90–20283–B (mjn).
Adv. No. 90–0275.

United States Bankruptcy Court,
W.D. Tennessee, W.D.

July 9, 1991.

**988**

Jack F. Marlow, Memphis, Tenn., Trustee.

David J. Cocke, F. Guthrie Castle, Borod & Kramer, Memphis, Tenn., for Trustee.

John W. McQuiston, II, Goodman, Glazer, Greener, Schneider, McQuiston & Kremer, P.C., Memphis, Tenn., for Oakland Gin.

Donald E. Bourland, Memphis, Tenn., for Federal Compress and Warehouse, Inc.

## MEMORANDUM OPINION AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

WILLIAM H. BROWN, Bankruptcy Judge.

This cause is before the Court on the parties' cross motions for summary judgment. At issue is whether it may be determined as a matter of law which of the parties has superior rights to the proceeds of the property at issue. The proceeding is core pursuant to 28 U.S.C. § 157(b)(2)(E). The following constitutes findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure ("F.R.B.P.") 7052 and 7056.

The plaintiff and counterdefendant in this proceeding is Jack F. Marlow, ("Trustee") duly appointed Trustee of the Chapter 11 debtor, The Julien Company ("Debtor"). The defendant and counterclaimant herein is the Oakland Gin Company, Inc. ("Oakland"), an Alabama corporation engaged in the business of ginning and, on occasion, marketing cotton for its customers who are cotton producers.

## PROCEDURAL CONSIDERATIONS

As will be discussed below, the dispute here is over entitlement to the sales proceeds from 360 bales of cotton that the prepetition debtor agreed to purchase from Oakland and certain farmers but for which payment was not made. Both the Trustee and Oakland have filed motions for summary judgment with supporting memoranda, depositions, exhibits and affidavits.

Subsequent to these filings, the summary judgment motions were set for oral argument before this Court. At that time, Oakland, through counsel, presented arguments in support of its position which had not been raised previously. (Transcript of 2/9/91 hearing, pp. 48–49) Among these "new" arguments is Oakland's contention that if the Court finds that it is not entitled to the proceeds based on its earlier arguments, it is, alternatively, entitled to the proceeds because it reclaimed the cotton prior to the bankruptcy and in accordance with state law. In response, the Trustee has filed a Motion to Strike this argument asserting that reclamation is an avoidance defense which must be set forth affirmatively in the pleadings pursuant to F.R.B.P. 7008(c). Following this, the defendant filed a Motion To Amend Its Pleadings to plead reclamation as an alternative defense. In its motion to amend, Oakland does not deny that its reclamation argument is an affirmative defense; rather, it seeks leave of the Court to raise reclamation by amendment to its pleadings.

Federal Rule of Civil Procedure ("F.R.C.P.") 8(c), made applicable to bankruptcy adversary proceedings by F.R.B.P. 7008, provides, in pertinent part:

(c) Affirmative Defenses. In pleading to a preceding pleading, a party *shall* set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, dis-

charge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment release, res judicata, statute of frauds, statute of limitations, waiver, and *any other matter constituting an avoidance* or affirmative defense ...

(Emphasis added)

■ Given that the rule requires rather than permits the pleading of an affirmative defense, it is well settled that the failure to so plead may result in a waiver of the defense. This is because "an affirmative defense raises matters extraneous to the plaintiff's *prima facie* case." *Ford Motor Co. v. Transport Indem. Co.*, 795 F.2d 538, 546 (6th Cir.1986); *see also Macurdy v. Sikov & Love, P.A.*, 894 F.2d 818, 824 (6th Cir.1990). However, it is also well settled that the liberal pleading rules established by the Federal Rules of Civil Procedure are applicable to the pleading of affirmative defenses. *Hassan v. U.S. Postal Service*, 842 F.2d 260, 263 (11th Cir.1988). Inasmuch as these liberal rules of pleading provide for the amendment of pleadings by "leave of court ... when justice so requires," it is generally held that "when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the ... court to hear evidence on the issue." *Id.;* F.R.C.P. 15(a); *see also Macurdy v. Sikov*, 894 F.2d at 824.

■ Although not set forth in the original answer, the reclamation defense asserted here was raised in connection with Oakland's motion for summary judgment. The plaintiff has been given an opportunity to respond on the merits and in fact has so responded with a supplemental memorandum filed with the Court after conclusion of the oral arguments. The matters at issue have not been set for trial pending the Court's disposition of the summary judgment motions. Given these circumstances, the Court can not conclude that the plaintiff has been unfairly prejudiced by Oakland's assertion of its reclamation defense. Oakland's motion to amend its pleadings to affirmatively plead reclama-

tion as an alternative defense shall be granted.

## SUMMARY JUDGMENT

In order to grant either parties' requested relief in this proceeding, the Court must find that the

pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*In re Marlar*, 120 B.R. 51, 55 (Bankr. N.D.Miss.1989); F.R.B.P. 7056. "[A]n issue is genuine if 'there is sufficient evidence favoring the nonmoving party for a fact finder to find for that party' ... A fact is material if it would affect the outcome of the lawsuit under the governing substantive law." *Id.* at 56. With these precepts in mind [1], the Court begins its determination of whether either party here is entitled to a summary judgment.

## FACTUAL SUMMARY

The record reflects that prior to the filing of the debtor's bankruptcy petition on January 10, 1990, the debtor was a cotton merchant in the business of buying and selling cotton. In that capacity, the debtor made arrangements during the summer of 1989 to purchase bales of cotton from twenty-three cotton producers who were customers of Oakland. The purchase arrangements were orchestrated by Mr. E.E. (Buddy) Pesnell, a cotton broker, Mr. Samuel Rice, the operator and majority owner of Oakland, and Mr. John Leary, a cotton merchant formerly employed by the debtor. (Depositions of Mr. Rice, pp. 8, 9, 11, 13, 15; Mr. Pesnell, p. 21; Mr. Leary, p. 41)

Oakland participated in arranging the transactions as agent on behalf of its twenty-three customers. (Depositions of Mr. Rice, pp. 8–9, 11–13, 15; Mr. Pesnell, p. 22) The agreement which established the terms of the transactions was negotiated by Mr.

---

1. For a thorough discussion of summary judgment as it is affected by only genuine issues of material fact, *see, In re Suburban Motor Freight, Inc.,* 124 B.R. 984, 991 (Bankr.S.D.Ohio 1990).

Rice and Mr. Leary, through Mr. Pesnell, acting as the broker. Mr. Pesnell ultimately prepared written contracts evidencing the agreement. (Deposition of Mr. Pesnell, pp. 9–10, 11–12, 18–19, 21, 28–30; Exs. 1 & 2 to Deposition of Mr. Rice)

Pursuant to these agreements, most of the bales contracted for were purchased and paid for by the debtor without incident. However, the debtor did not pay for four 90–bale truckloads which were shipped to The Julien Warehouse between November 29 and December 7, 1989. (Ex. 3, Deposition of Mr. Rice; Affidavit of Danny Rounsavall) Oakland subsequently paid the producers of this cotton the amounts due them and succeeded to their rights under the producers' contracts. (Deposition of Mr. Rice, p. 48)

The contracts prepared by Mr. Pesnell are all on the same typed form. (Ex. 2, Deposition of Mr. Rice; Deposition of Mr. Pesnell, p. 23) There are twenty-three individual contracts executed by each selling producer and Mr. Leary. (Ex. 2, Deposition of Mr. Rice) Each of these contracts has a Julien Company contract number assigned to it as does a separate unexecuted "master contract" which purports to represent the agreement between the debtor and Oakland on behalf of the producers. (Exs. 1 and 2, Deposition of Mr. Rice) This master contract was never signed by either party but it contains pertinent language identical to that found in the twenty-three producer contracts. It was prepared by The Julien Company for ease of reference in the invoicing process. (Ex. 1, Deposition of Mr. Rice; Ex. 11, Deposition of Mr. Leary) The master contract recites that it "covers" the twenty-three producer contracts which are listed thereon by number. The master contract describes the duties of The Julien Company as the buyer and Oakland as seller and includes the following specific provisions which are relevant to these proceedings.

According to the contract, the cotton was to be transported "FOB trucks at Oakland Gin Company, Oakland, Alabama." (¶ 2, Ex. 1, Deposition of Mr. Rice) In addition, paragraph four provides:

PLACE OF PERFORMANCE: SELLER will invoice cotton at time of loading onto truck at a provisional price based on the net Gin weights with accompanying truck bill of lading and draw a draft on the BUYER. As official government class is received SELLER will deliver corrected invoice to BUYER at BUYER'S office. All obligations of this contract are performable and enforceable by both parties.

Paragraph thirteen sets forth:

DELIVERY AND CONTRACT NOT CONDITIONAL: Delivery of this contract is not subject to any condition not shown in writing on the face of the contract.

Remedies are provided for at paragraph fifteen:

REMEDIES: It is agreed that irreparable harm may be suffered by either party in case of nonperformance of this contract and that either party shall be entitled to obtain specific performance in the event of repudiation or failure or refusal of performance by the other party. The aggrieved party shall be entitled to temporarily and permanently enjoin violations of this contract. HOWEVER, THIS PARAGRAPH SHALL NOT BE TAKEN TO LIMIT THE RIGHT OF A PARTY TO RECOVER DAMAGES. Filing of suit for alternative relief shall not constitute as (sic) election of remedies, and a party may in a proper case recover specific performance of a part of the contract and damages for that part which the other party has failed or is unable to perform.

The parties further agreed at paragraph twenty that the contract is to be "governed by and interpreted in accordance with the laws of the state of Tennessee." Moreover, the parties represented at paragraph twenty-four that:

Both parties have carefully read and fully understand the terms and provisions of the foregoing contract which represents the entire agreement between the parties, and further understand that

there may be no modification of this performance of this contract.

(Ex. 1, Deposition of Mr. Rice)

According to the testimony of the parties involved in the transactions, i.e., Messrs. Leary, Rice and Pesnell, the provisions of the master contract were implemented as follows:

The producers would bring their cotton to Oakland where it would be ginned and loaded for shipment onto trucks owned or hired by Oakland. Nonnegotiable bills of lading printed and supplied by The Julien Company would then be completed by representatives of Oakland as directed by Mr. Pesnell so as to evidence the cotton contained in particular shipments. (Depositions of Mr. Rice, pp. 70–71, Ex. 3; Mr. Pesnell, p. 74) At the time of loading or shortly thereafter, drafts accompanied by the bills of lading were submitted to Union Planters National Bank in Memphis, Tennessee for payment for the cotton out of The Julien Company's account. (Depositions of Mr. Rice, pp. 36–38; Mr. Pesnell, pp. 55–56) Meanwhile, the cotton would be transported, at The Julien Company's expense, to The Julien Warehouse at Attalla, Alabama, in accordance with paragraph two of the contract. Once at the warehouse, it became known as "flow through" cotton or cotton which was to be shipped to its ultimate purchasers, e.g., textile mills, within hours or days of its arrival and which was therefore not "stored" nor subject to the issuance of warehouse receipts. (Deposition of Mr. Leary, p. 29; affidavit of Frank M. Weathersby, Jr.)

According to further testimony before the Court, the fact that no warehouse receipts were issued in these transactions distinguishes them from the most common means of buying and selling cotton in this geographic region. (Depositions of Mr. Rice, pp. 30–37; Mr. Pesnell, pp. 34, 39; affidavit of Danny Rounsavall) Mr. Leary testified that the most common means of buying and selling cotton involves the transportation of cotton, after it is ginned, to a federally licensed warehouse which issues a warehouse receipt and sample fee, less accrued storage charges for the cotton, to the producer. The warehouse receipt serves as the indicia of ownership. Subsequently, the cotton is sold with the purchaser acquiring the warehouse receipt therefor as evidence of ownership. (Deposition of Mr. Leary, pp. 55, 60)

As noted above, in the transactions at issue involving "flow through" cotton, the cotton was not intended to be stored and no warehouse receipts were issued because the cotton was to remain at the warehouse for only a short time. (Deposition of Mr. Leary, pp. 29, 95) An advantage of such a "flow through" transaction to both seller and buyer is that less warehouse charges are involved. (*Id.*) An additional advantage for the buyer, and one of paramount importance to The Julien Company's former president, is that the cotton could be shipped to the textile mills much faster than with the use of warehouse receipts. (Deposition of Mr. Leary, pp. 22, 28)

However, a potential disadvantage for the sellers here was that possession of the cotton or evidence of ownership via, for example, a warehouse receipt may have been relinquished prior to the seller's receipt of payment. In order to avoid the occurrence of nonpayment in connection with the transactions at issue here, the parties agreed that Oakland would be paid a provisional price for the cotton upon submission of the bills of lading and drafts to the debtor's bank prior to the debtor's receipt of the cotton. (Depositions of Mr. Pesnell, pp. 55–56; Mr. Leary, pp. 64, 92; Mr. Rice, p. 40) This agreed upon intention is evidenced by paragraph four of the contract set forth above.

Moreover, given the absence of warehouse receipts, Mr. Pesnell testified that the bills of lading were to serve as evidence of the seller's "collateral control" or title and were used in conjunction with the drafts for payment as if they were "receipts." (Deposition of Mr. Pesnell, pp. 35–36, 47, 55–56) Mr. Rice testified that the "substitute for the warehouse receipt was to be the bill of lading and that was what the bank was to pay on." (Deposition of Mr. Rice, p. 36)

The bills of lading themselves were printed by The Julien Company and completed, by hand, by Mr. Rice or other representatives of Oakland. The printed provisions of the documents indicate that the shipper of the cotton described thereon is The Julien Company. The handwritten provisions designate the Oakland Gin Company as the shipper's agent and The Julien Warehouse as the consignee of the shipments. (Deposition of Mr. Rice, Ex. 5)

As noted above, use of the bills of lading and compliance with this payment procedure resulted in the uneventful purchase of and payment for numerous bales of cotton by The Julien Company. However, 360 bales transported in four 90–bale truckloads on November 29, 1989, December 4, 1989 and December 6, 1989 (2 truckloads) were not paid for. Specifically, the four truckloads were as follows:

Truck 1: Loaded at Oakland on November 29, 1989, and delivered 90 bales to The Julien Warehouse on that day.

Truck 2: Loaded at Oakland on December 4, 1989, and delivered 90 bales to The Julien Warehouse on that day.

Truck 3: Loaded at Oakland on December 6, 1989, and delivered 90 bales to The Julien Warehouse on December 7, 1989.

Truck 4: Loaded at Oakland on December 6, 1989, and delivered 90 bales to The Julien Warehouse on December 6, 1989.

(Trustee's First Amended Complaint, p. 3). Drafts for $80,369.78 presented for payment on December 6 and 7, 1989 were returned along with the corresponding bills of lading to Oakland without payment. Similarly, a draft for $27,134.00 presented for payment on December 7 was returned, along with bills of lading, unpaid to Oakland. (Ex. 6, Deposition of Mr. Rice) At that time, Mr. Rice learned that "the Julien Company was in financial trouble." (Deposition of Mr. Rice, p. 86)

Consequently, on December 7, 1989, Mr. Rice contacted representatives of Federal Warehouse and Compress ("Federal Compress"), The Julien Warehouse's managing agent, and demanded return of the cotton.

The following day, Mr. Rice sent a truck to the warehouse and again demanded the cotton's return. That same day representatives of Federal Compress refused Oakland's demand but notified The Julien Company, by letter, of the demand. (Deposition of Mr. Rice, pp. 89, 98, Ex. 7) Federal Compress further requested notification from The Julien Company of its intentions with respect to the cotton by December 12, 1989. On that date, The Julien Company notified Federal Compress that it could not agree to the release of the cotton to Oakland. As a result, on December 14, 1989, Federal Compress commenced an interpleader action in the Circuit Court of Etowah County, Alabama. (Deposition of Mr. Rice, p. 96, Ex. 7)

During the pendency of the interpleader action, on January 10, 1990, an involuntary Chapter 7 bankruptcy petition was filed against the debtor. On January 11, 1990, the involuntary petition was converted to a voluntary Chapter 11 and an order for relief was entered. Mr. Marlow was subsequently appointed Trustee.

Thereafter, the Trustee and Oakland agreed by consent order to the Trustee's sale of the cotton with their respective claims being transferred to the sale proceeds of $132,579.03. The parties further agreed to the removal of the interpleader action to this Court in the form of this adversary proceeding.

## FINDINGS AND CONCLUSIONS

■ From these facts, which are largely undisputed, it is the Trustee's position that the proceeds at issue are property of the debtor's estate subject to turnover. Indeed, the Trustee's amended complaint is brought pursuant to Bankruptcy Code § 542 which provides in relevant part:

... [A]n entity, other than a custodian, in possession, custody, or control during the case of property that the trustee may use, sell, or lease under section 363 of this title ... shall deliver to the trustee, and account for, such property, or the value of such property ...

Section 363 provides that the trustee may use, sell, or lease "property of the estate." "Property of the estate" is defined at 11 U.S.C. § 541(a) as all legal and equitable interests of the debtor in property at the commencement of the bankruptcy case. As such, turnover is not intended as a remedy to determine the disputed rights of parties to property. *See, e.g., In re Gallucci,* 931 F.2d 738, 741 (11th Cir.1991); *In re FLR Co. Inc.,* 58 B.R. 632, 634 (Bankr. W.D.Pa.1985). Rather, turnover is intended as a remedy to obtain what is acknowledged to be property of a debtor's estate. Therefore, the ultimate issue for determination here is the extent of the debtor's legal and equitable interests, if any, at the commencement of the case. It might be questionable whether the Trustee has sought the correct remedy here; however, any question is answered in favor of the Court's subject matter jurisdiction because the Trustee's First Amended Complaint prays for the Court to determine that the escrowed proceeds are property of the estate and to extinguish Oakland's claims to those funds. *See,* 28 U.S.C. § 157(b)(2)(O). This amounts to declaratory judgment relief over which the bankruptcy court may have subject matter jurisdiction. *See,* F.R.B.P. 7001(2) and (9). In addition, Oakland's counterclaim seeks interpleader and prays for a determination that the escrowed proceeds belong to Oakland, for reformation of the contract, and for reclamation.

Oakland disputes that the property may be considered property of the estate because, under the terms of the parties' agreement and the circumstances here, Oakland, as the seller of the cotton, retained all rights to and interests in the cotton and its proceeds. In the alternative, Oakland contends that it is entitled to the cotton proceeds because the contract is subject to reformation to reflect the parties' true intentions; that the Trustee may be estopped from asserting a position contrary to the parties' intentions; that Oakland exercised a stoppage of the goods in transit; and that Oakland complied with relevant reclamation procedures.

It is well settled that while § 541 of the Bankruptcy Code generally renders all interests of the debtor in property as of the commencement of the case property of the estate, "the Bankruptcy Code does not define a debtor's interest in property, [rather], the answer to that question must be made after reference to state law." *In re White,* 851 F.2d 170, 173 (6th Cir.1988). This is because "property interests are created and defined by state law." *Ambrose Branch Coal Co., Inc. v. Tankersley,* 106 B.R. 462, 465 (W.D.Va.1989), *quoting Butner v. U.S.,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979).

In order to determine the extent, if any, of the debtor's interest in the cotton under applicable law at the commencement of the case, the Court must ascertain the parties' intentions and the legal effect of those intentions as evidenced by the contracts and by the events which occurred after the contracts' execution.

The applicable state law for purposes of determining the parties' property interests in this proceeding is Tennessee law pursuant to paragraph twenty of the contract. Moreover, because the parties' interests arise out of a sales transaction, both parties rely largely on Article Two of the Tennessee Uniform Commercial Code (hereinafter "UCC") governing sales as supportive of their respective positions. Certain other provisions of the UCC also have relevance here as will be discussed below.

## POSSESSION AND SECURITY INTEREST

It is clear from the testimony[2] of Messrs. Rice, Pesnell, and Leary, as well as from paragraph four of the master contract, that at the time of contracting, the

---

**2.** The Court recognizes the applicability of the parol evidence rule where, as here, the parties have reduced their agreement to writing and agreed to no modifications. However, the testimony referred to here tends to explain or supplement rather than contradict the written agreement; moreover, the master contract which contains the critical terms was apparently never signed by the parties. Thus, the parol evidence rule is not applicable and the testimony will be allowed for consideration. Tennessee Code Annotated § 47–2–202.

parties intended for Oakland to receive payment for the cotton prior to or simultaneously with its arrival at The Julien Warehouse. Indeed, the Trustee concedes as much. (*See*, Reply to Defendant['s] ... Response ..., p. 3) It is apparent from the uncontroverted testimony of Messrs. Rice and Pesnell that the parties intended that the bills of lading would evidence title to or the right to control disposition of the cotton and that the defendant continues to possess the bills of lading, after regaining possession from the bank to which drafts were submitted. The evidence further establishes that notwithstanding these intentions, Oakland delayed submission of the drafts, with the attached bills of lading, for payment at least until after the cotton was loaded on the trucks, contrary to paragraph four of the agreement. (Deposition of Mr. Rice, pp. 77–78, Exs. 3, 4, and 5) Indeed, Mr. Rice testified that "sometimes" over the course of performing under the contract, he would "accumulate" several drafts before submitting them for payment and sometimes he would submit them "promptly." (Deposition of Mr. Rice, pp. 77–78) Thus, while it is clear that the parties intended for payment to be simultaneous with shipment, the fact is, with respect to these four shipments, Oakland shipped the cotton before demanding payment. Consequently, while there is no dispute that Oakland is entitled to a claim for payment for the cotton, the issue becomes whether, given these circumstances, Oakland's claim is superior to that of the Trustee.

It is essentially the Trustee's position that by relinquishing physical possession of the cotton to The Julien Warehouse, prior to its receipt of payment, Oakland lost all right, title and interest therein, regardless of the parties' original intentions. The Trustee further contends that Oakland's rights were not reinstated by any actions it took subsequent to its relinquishment of possession. At the outset, it should be noted that the Trustee's position is premised on the theory that transfer of the cotton to The Julien Warehouse was the equivalent of delivering the cotton and transferring title to the buyer, The Julien Company.[3] As such, according to the Trustee, application of the UCC to the contractual terms and circumstances at bar necessarily results in Oakland's loss of title to and thus, any interest in, the cotton. Specifically, the Trustee contends that because the contract terms at issue provide that the cotton was to be "F.O.B. trucks at Oakland Gin ...," this is a shipment contract whereby the seller's performance, i.e., delivery, and passage of title, were to be accomplished upon the loading of the trucks. As support for his position, the Trustee relies upon § 47–2–401 and § 47–2–319 of the UCC. It is noted that each of the twenty-three producer contracts contains the same "F.O.B. trucks at Oakland Gin ..." language. (Ex. 2, deposition of Samuel Rice)

Also in reliance on the language of § 47–2–401 and § 47–2–319, Oakland disputes the Trustee's contention, asserting that neither delivery nor passage of title was accomplished. Oakland further argues that transport to the warehouse was not the equivalent of transport to the buyer.

Section 47–2–401 describes the "passage of title" and provides, in pertinent part:

**Passing of title—Reservation for Security—Limited application of this section.**—Each provision of this chapter with regard to the rights, obligations and remedies of the seller, the buyer, purchasers and other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this chapter and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (§ 47–2–501) and unless otherwise explicitly agreed the

**3.** See ¶ 6, affidavit of Mr. Frank M. Weathersby, Jr., majority owner and chief operating officer of Weathersby and Eugenia Cotton Companies: "In the ordinary course of business, cotton merchants only take possession of cotton through the utilization of an agent or bailee, typically a cotton warehouse."

buyer acquires by their identification a special property as limited by chapters 1 through 9 of this title. Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. Subject to these provisions and to the provisions of the chapter on Secured Transactions ..., title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place; and in particular and despite any reservation of a security interest by the bill of lading;

(a) if the contract requires or authorizes the seller to send the goods to the buyer but does not require him to deliver them at destination, title passes to the buyer at the time and place of shipment; ...

(4) A rejection or other refusal by the buyer to receive or retain the goods, whether or not justified or a justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a "sale."

Section 47–2–319 discusses F.O.B. terms as follows:

**F.O.B. and F.A.S. terms**—(1) Unless otherwise agreed the term F.O.B. (which means "free on board") at a named place, even though used only in connection with the stated price, is a delivery term under which:

(a) when the term is F.O.B. the place of shipment, the seller must at that place ship the goods in the manner provided in this chapter (§ 47–2–504) and bear the expense and risk of putting them into the possession of the carrier ...

The Trustee submits that inasmuch as § 47–2–319 defines "F.O.B." as "a delivery term," and the contracts here provide that the cotton was to be "F.O.B. trucks at Oakland Gin ...," "delivery" of the cotton was accomplished, i.e., the seller's performance was completed when the trucks were loaded at Oakland. Moreover, because the F.O.B. provision of the contract does not require the seller to deliver the cotton at a destination, title passed to the buyer at the time the trucks were loaded pursuant to § 47–2–401(2)(a).

Oakland counters these assertions by referring to the fact that both UCC provisions quoted above provide that their terms are applicable "unless otherwise agreed." Moreover, § 47–2–401 is said to be applicable "[i]nsofar as situations are not covered by other provisions of this chapter." Thus, it is Oakland's position, pursuant to the testimony of the parties involved, that it was "otherwise agreed" in this transaction that the F.O.B. provision was not a delivery term but rather, a means of ensuring that the buyer, The Julien Company, would pay for shipment of the cotton although shipment was to be physically accomplished by Oakland with its trucks.

According to Oakland, the "delivery" term of the contract is found in paragraph four of the contract (quoted above) which is styled "PLACE OF PERFORMANCE" and essentially provides that performance involves the seller's invoicing the cotton at a provisional price and drawing a draft on the buyer with an accompanying bill of lading at the time the cotton is loaded on the trucks. Consequently, it was the parties' agreement that no performance or delivery was to occur until a draft had been drawn on the buyer, the cotton paid for, and the bills of lading, evidencing title, delivered to The Julien Company, according to Oakland. Therefore, Oakland argues that inasmuch as the drafts for these particular bales of cotton were not honored, delivery of the documents of title and accordingly "delivery" of the cotton pursuant to the parties' agreement was not accomplished.

█ It is clear from the language of both §§ 47–2–401 and 47–2–319 that the parties to a sale agreement are indeed authorized to agree on terms which differ from those contained in the UCC sections. This is consistent with the purpose and policies of the UCC described in Tennessee Code Annotated § 47–1–102(3). As such, it is clear that the parties here could agree that "F.O.B. trucks at Oakland Gin...." was to mean simply that the buyer was to pay for the cost of shipment rather than that "delivery" or performance by the seller was to be completed upon that occurrence. It is further clear from the "Place of Performance" provision of the contract, coupled with the parties' testimony, that this is in fact the substance of the agreement. Therefore, the Court concludes that as to the "F.O.B." term, the parties varied its meaning from that supplied by the UCC, consistent with the UCC's allowance of variation. *See*, Tennessee Code Annotated § 47–2–319 and § 47–1–102(3). Accordingly, neither the seller's performance nor delivery was completed at the time the trucks were loaded. Rather, the seller's performance was completed upon delivery to The Julien Warehouse.

Just as it is clear that the parties here could "otherwise agree" upon the effect of the contract's "F.O.B." term, it is clear that the parties could also agree on when title to the cotton would pass to the buyer. Tennessee Code Annotated § 47–2–401(1). However, it is equally clear that when such an agreement involves retention of documents of title after shipment or delivery, it is limited in effect to the granting of a security interest in favor of the seller. Tennessee Code Annotated § 47–2–401(1); § 47–1–201(37); *In re Tom Woods Used Cars, Inc.*, 24 B.R. 529, 530 (Bankr. E.D.Tenn.1982).

It is apparent from careful consideration of the evidence before the Court that the parties here intended to accomplish a sale with delivery of both the cotton and the bills of lading as evidence of the sale. It is further evident that pursuant to these intentions, the cotton was shipped and delivered[4] to The Julien Warehouse per the instructions and on behalf of the buyer with the seller retaining the documents of title. Thus, even though the original intention was that the seller would receive payment upon delivery of the bills of lading through normal banking channels prior to placement of the cotton at the warehouse, the actual result is that the seller retained the bills of lading after shipment and placement of the cotton. Under § 47–2–401(1), this result is limited in effect to the reservation of a security interest.

█ In order to be a perfected security interest, enforceable against one occupying the status of the Trustee, § 47–2–401 directs that compliance with the provisions of Article 9 governing secured transactions is required. Such a requirement assures that the UCC's purpose of affording notice to third parties of asserted interests in property is enforced. In this regard, § 47–9–113 mandates:

A security interest arising solely under the chapter on sales ... is subject to the provisions of this chapter [i.e., filing of financing statement required, § 47–9–302] except that to the extent that and so long as the debtor [buyer] does not have or does not lawfully obtain possession of the goods:

(a) no security agreement is necessary to make the security interest enforceable; and (b) no filing is required to perfect the security interest; and (c) the rights of the secured party on default by the debtor are governed by the chapter on sales ...

Obviously, from this language, possession of the collateral or the filing of a UCC–1 financing statement is required for one in the position of this seller to have a perfected security interest. "[W]hen a seller loses

---

4. The UCC defines "delivery" as "voluntary transfer of possession." § 47–1–201(14). "Possession" is not defined by the UCC but relevant case law defines it as the "right to control goods in the possession of another." *In re Ault*, 6 B.R. 58, 65 (Bankr.E.D.Tenn.1980) Oakland contends it did not relinquish its right to control the cotton when it was deposited at the warehouse. However, application of § 47–2–401 is triggered by "shipment" or "delivery." There is no dispute that the cotton was "shipped," thus § 47–2–401 is applicable here.

possession of the goods the Article 2 security interest not only becomes unperfected but essentially ceases to exist." *In re Ault,* 6 B.R. at 65. This, of course, raises the question of the meaning of possession in this context. It has been held that "possession" in this context includes "the right to control goods in the physical possession of another." *Id.* Such a definition is consistent with § 47–9–305 which provides that where goods ("other than goods covered by a negotiable document") are in the physical possession of a bailee "with notification of the secured party's interest," the secured party is "deemed to have possession" from the time the bailee receives such notification. Under such circumstances, actual physical possession or a UCC–1 filing is unnecessary in order for the secured party's interest to be perfected by possession.

It is uncontroverted in this proceeding that no UCC–1 financing statement was filed with respect to the cotton at issue. It is equally uncontroverted that actual physical possession of the cotton was transferred to The Julien Warehouse and that the warehouse received notification of Oakland's interest by virtue of its demand for return of the cotton.[5] It is disputed, however, that the warehouse served or could have served as a bailee for Oakland. Oakland argues that the warehouse served a dual role as bailee for Oakland and for the debtor and that therefore its demand for return of the cotton was sufficient to perfect its security interest therein. *See, In re Ault,* 6 B.R. at 65 (allowing warehouse to serve as dual agent). On the other hand, the Trustee contends that the warehouse was solely the buyer's designated agent and bailee pursuant to the bills of lading, customary practices in the industry, and the fact that the warehouse's shareholders and officers were the same as those of the debtor. Agreement with the Trustee would doubtless defeat Oakland's claim of a perfected security interest under § 47–9–305 because it would establish possession or the right of control in the debtor rather than in the seller.

Turning first to the bills of lading, as discussed above, they designate The Julien Company as shipper with The Julien Warehouse as The Julien Company's consignee. Oakland is referred to as the shipper's agent. As to the customary practices in the industry, the Court has before it the uncontroverted affidavit of Mr. Weathersby to the effect that, ordinarily, the only means of taking possession of cotton employed by a merchant such as the debtor is through the use of a warehouse. Finally, it has been established in a prior adversary proceeding before this Court that the debtor and The Julien Warehouse share officers and shareholders and that the warehouse is in fact an affiliate of the debtor, while its manager, Federal Compress and Warehouse, Inc., is an agent of the debtor. *Marlow v. Julien Warehouse, Inc., Federal Compress & Warehouse Company, Inc. and Julien J. Hohenberg (In re The Julien Company),* Ch. 11, Case Number 90–20283-B, Adv.Pro. No. 90–0093, slip opinion at pp. 17, 26 (Bankr.W.D.Tenn., as revised April 18, 1991). That same opinion established that between December, 1988, and January 10, 1990, the only cotton at The Julien Warehouse was cotton controlled by The Julien Company or its affiliates. *Id.* at p. 10; *see also* Exs. L N & O to Trustee's response brief. The Court can not ignore these prior factual findings.

The above factors weigh heavily toward a finding that the warehouse was controlled by and thus was exclusively an agent or bailee for the debtor. However, Oakland argues vigorously that this was not the parties' intentions in these transactions and that regardless of the terms printed on the bills of lading everyone involved knew and understood that the cotton was received at the warehouse from Oakland. The defendant's argument is somewhat supported by the actions taken by the warehouse after it received Oak-

---

5. Under the UCC § 47–1–201(26), "[a] person 'receives' a notice or notification when: (a) it comes to his attention, or (b) it is duly delivered at the place of business through which the contract was made or at any other place held out by him as the place for receipt of such communications."

land's demand for return of the cotton, i.e., the letter to the debtor and the interpleader action.

It is apparently the law in Tennessee that although a bailment is "ordinarily created by delivery and acceptance pursuant to an agreement," such "may result from conduct, though neither foreseen or contemplated." Moreover, "where a person having possession of a chattel holds it under such circumstances that an obligation to deliver to another is imposed by law," at a minimum, a "constructive bailment" is said to arise. *In re Crabtree*, 48 B.R. 528, 532 (Bankr.E.D.Tenn.1985). *See also, Marlow v. Rollins Cotton Co. v. Bankers Trust Company and L & S Cotton Systems, Inc. (In re The Julien Company)*, 127 B.R. 604, 618 (Bankr.W.D.Tenn.1991).

Given this precedent, the Court is impressed by the actions of the warehouse's manager after receipt of Oakland's demand for the cotton in sending a letter to the debtor wherein the manager stated, in pertinent part:

We are advised that you may have some claim to this cotton. If so, then we must have written, clear and unconditional confirmation of your claim to title and possession ...

Otherwise, *we are advised we are legally bound to surrender possession to Oakland Gin.*

If you do claim title and possession, and Oakland Gin Co., Inc. does not release its claim, we will file an interpleader in a court of competent jurisdiction to determine the rights of the parties.

(Deposition of Mr. Rice, Ex. 7) Emphasis added.

From this language, it is evident that the warehouse believed that it held the cotton under "such circumstances that an obligation to deliver" it to Oakland was "imposed by law." *In re Crabtree*, 48 B.R. at 532. However, the belief held by the warehouse manager is not the equivalent of an actual legal obligation to redeliver the cotton to Oakland, and the Court can not conclude that the warehouse held the cotton as a constructive bailee for Oakland. Assuming such a conclusion could be

reached, Oakland's notification of its asserted interest to the warehouse came after Oakland had delivered the cotton and after Oakland had learned of the dishonor of the drafts. No "relation back" of a perfected security interest is allowed under § 47–9–305. Inasmuch as Oakland's security interest could only become perfected after a gap in time, the interest of any other secured creditors and of the Trustee as a judicial lien creditor is superior to Oakland's claim to the cotton and its proceeds. *See* 11 U.S.C. § 544.

It is important to keep in perspective what the parties' actions demonstrate: (1) Oakland ginned and loaded the cotton on its trucks; (2) risk of loss passed to the debtor upon loading; (3) Oakland delivered the cotton to The Julien Warehouse, an affiliate of the debtor; (4) Oakland delayed in forwarding the drafts and bills of lading for collection; (5) Oakland charged for and was paid by the debtor for the delivery fees; (6) Oakland, after nonpayment of the drafts, demanded return of the cotton on which no security interest had been contemplated or retained. In essence, the actions of Oakland are those of a seller which assumed the risk of selling on unsecured credit. Oakland followed neither the terms of the written contract nor the terms of the oral understanding. Oakland had a means of protecting itself by retaining and perfecting a security interest. Or, had Oakland delivered to the warehouse and at that time given notice of its possessory security interest, the Court's conclusion may have been in favor of Oakland. But, in contrast to this Court's conclusion in adversary proceeding 90–0104, mentioned hereinabove, this warehouse as a purported constructive bailee did not issue any warehouse or other receipts to Oakland. There was no indicia to the parties or the public that The Julien Warehouse was holding this cotton for anyone other than the debtor until Oakland demanded of the warehouse that it return the cotton. The mere fact that the warehouse instituted a state court interpleader did not alter the legal or factual positions of the parties.

RECLAMATION

As discussed above, Oakland contends that, in the alternative, it's claim to the cotton proceeds is superior to that of the Trustee because it made a timely demand for reclamation under applicable state law, specifically Tennessee Code Annotated § 47–2–702:

(2) Where the seller discovers that the buyer has received goods on credit while insolvent he may reclaim the goods upon demand made within ten days after the receipt, ...

(3) The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under this chapter (§ 47–2–403). Successful reclamation of goods excludes all other remedies with respect to them.

It is settled in Tennessee that a demand alone rather than the taking of physical possession is sufficient for compliance with this section. *Liles Bros. & Son v. Wright,* 638 S.W.2d 383, 387 (Tenn.1982).

■ With respect to circumstances calling for application of this section in the bankruptcy context, it has been stated:

... between the seller and the buyer who has received goods but failed to pay as agreed, the seller doubtlessly has the superior right to the goods. It is a general rule that as successor to the bankrupt debtor, the trustee in bankruptcy acquires in the debtor's property no greater interest than the debtor has.

*In re Tom Woods Used Cars, Inc.,* 24 B.R. 529, 530 (Bankr.E.D.Tenn.1982). Further, in this context, a demand for reclamation is not considered a violation of the automatic stay when the reclamation period expires postpetition. *In re Production Steel,* 21 B.R. 951, 953 (Bankr.M.D.Tenn.1982). However, while the above are general rules, it is equally well settled that at the time of the filing of a bankruptcy petition, "the trustee also acquires the rights of a creditor who has a perfected judgment lien on the debtor's property without knowl-

edge of any claims ... by third parties." *In re Tom Woods Used Cars, Inc.,* 24 B.R. at 530.

In order to reconcile these general rules in the reclamation situation, the drafters of the Bankruptcy Code inserted 11 U.S.C. § 546(c) which provides, in pertinent part:

... the rights and powers of a trustee under sections 544(a), 545, 547 and 549 of this title are subject to any statutory or common law right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, but

(1) such a seller may not reclaim any such goods unless such seller demands in writing reclamation of such goods before ten days after receipt of such goods by the debtor; and

(2) the court may deny reclamation to a seller with such a right of reclamation that has made such a demand only if the court—

(A) grants the claim of such seller priority as a claim of a kind specified in section 503(b) of this title; or

(B) secures such claim by a lien.[6]

It should be noted that for purposes of this section both credit and cash sellers are required to demand return of the goods within ten days after delivery or lose the right to reclaim against a third party. *In re Tom Woods Used Cars, Inc.,* 24 B.R. at 531; *see also Cong. Rec.* H11097 (daily ed. Sept. 28, 1987), S17413–14 (daily ed. Oct. 6, 1978) reprinted at *Norton Bankruptcy Code Pamphlet* 1990–91 ed., p. 480. All requirements of § 546(c) must be met before a seller will be allowed to reclaim in a bankruptcy case. *See, e.g., In re Video King of Illinois,* 100 B.R. 1008, 1013 (Bankr.N.D.Ill.1989).

■ Moreover, both § 546(c) of the Bankruptcy Code and § 47–2–702(2) of the UCC call for their application when the debtor has received goods while "insolvent." The only evidence of the debtor's insolvency at the time the cotton was deliv-

6. It should be noted that the trustee's complaint is brought pursuant to § 542, a section not specified as one to which § 546(c) applies. Thus, at first glance, it appears that § 546(c) does not

apply to this proceeding. However, the trustee's § 544(a) strongarm powers are acquired upon the filing of the petition, rendering § 546(c) applicable.

ered to the warehouse is Mr. Rice's testimony that he had learned of the debtor's "financial trouble" from Mr. Pesnell and from a newspaper article. Section 546(c) refers to the Bankruptcy Code's definition of insolvency. "Section 101 defines 'insolvent' only in the bankruptcy sense (when the debtor's liabilities exceed its assets at a fair valuation)." 4 King, COLLIER ON BANKRUPTCY (1991) ¶ 546.04 at 546–17. By contrast, the UCC utilizes a definition of insolvency based upon an inability to pay debts in the ordinary course or as they come due. In the alternative, Tennessee's UCC definition now includes insolvency "within the meaning of the federal bankruptcy law." § 47–1–201(23); *see e.g., In re Storage Technology Corp.*, 48 B.R. 862 (Bankr.D.Colo.1985). There is no proof of the debtor's insolvency, as defined by the Bankruptcy Code, at the time of delivery; therefore, the Court could not grant summary judgment to Oakland on reclamation.

■ Moreover, it is the Trustee's position that § 546(c) provides the exclusive remedy for a reclaiming seller in the bankruptcy context and inasmuch as Oakland did not itself make *written* demand upon the debtor, its right to reclamation is unenforceable against the trustee. The Trustee's position apparently represents the majority view. *See, e.g., Matter of Marin Motor Oil, Inc.*, 740 F.2d 220 (3rd Cir. 1984); *In re Rawson Food Service, Inc.*, 846 F.2d 1343 (11th Cir.1988); *In re Production Steel, Inc.*, 21 B.R. 951 (Bankr. M.D.Tenn.1982); *In re Dynamic Technologies Corp.*, 106 B.R. 994 (Bankr.D.Minn. 1989).

Oakland counters this argument by referring the Court to two cases which hold that where, as here, oral reclamation, sufficient under state law, is timely made prior to the bankruptcy's intervention, it is enforceable against the Trustee. *In re Bearhouse, Inc.*, 84 B.R. 552 (Bankr.W.D.Ark. 1988); *In re A.G.S. Food Systems, Inc.*, 14 B.R. 27 (Bankr.D.S.C.1980). This Court will not follow the minority position of *Bearhouse* and *A.G.S.* Section 546(c) was in effect when Oakland delivered this cot-

ton and Oakland is charged with knowing that § 546(c) would be applicable in the event of bankruptcy of the debtor, an event which should not be surprising to any seller such as Oakland. Moreover, *Bearhouse*, 84 B.R. at 560, and *A.G.S.*, 14 B.R. at 29, recognize that compliance with state law but noncompliance with § 546(c) would leave sellers such as Oakland exposed to the trustee's avoidance powers.

Given these facts and circumstances, the Court concludes that there was no proof of the debtor's insolvency. However, assuming insolvency, the absence of strict compliance with § 546(c)'s written demand by the seller would defeat Oakland's reclamation relief. Consequently, although the evidence reflects that Oakland made a timely oral reclamation demand upon the warehouse for return of the cotton in accordance with § 47–2–702 and that some extent of the debtor's financial trouble was known to Oakland at that time, such satisfaction of state law requirements does not, in this instance, satisfy federal law.

### UNITED STATES WAREHOUSE ACT

■ Oakland raised at oral argument that The Julien Warehouse, acting through its manager Federal Compress, was subject to the United States Warehouse Act, 7 U.S.C. § 241 et seq., which imposed a statutory duty on the warehouse to return the goods to Oakland when demand was made. 7 U.S.C. § 262. As the Trustee points out, the provisions of this Act appear to apply only to agricultural products stored in a licensed warehouse for which receipts have been issued. *See,* 7 U.S.C. § 259. The evidence, as previously discussed, established that this cotton was flow-through cotton for which no warehouse receipts were issued, and storage was not contemplated. Moreover, there was no evidence of compliance with 7 U.S.C. § 262 which has specific requirements [7] and which recognizes that the warehouseman is not required to redeliver stored products if there is "some lawful excuse" for not doing so. Here, the warehouse was on notice of the competing claims of the debtor and Oak-

---

7. **7 U.S.C. § 262 Delivery of products stored on demand; conditions to delivery.** A warehouse-

man conducting a warehouse licensed under this Act in the absence of such lawful excuse,

land, resulting in the filing of the state court interpleader.

### STOPPAGE IN TRANSIT

■ Oakland also argued that it stopped the goods in transit pursuant to Tennessee Code Annotated §§ 47–2–703(b) and 705. This theory would depend upon The Julien Warehouse being Oakland's bailee. Assuming for argument that to be true, nevertheless, Oakland had completed its responsibility as seller when it ginned, loaded, and delivered the goods to the warehouse. At best, the warehouse was then a joint bailee for Oakland and the debtor. Oakland's right to stop the cotton in transit ceased when the buyer "either actually or constructively received the goods." *In re Contract Interiors, Inc.*, 14 B.R. 670, 675 (Bankr.E.D.Mich.1981). Furthermore, as the Trustee points out, a seller's right to stoppage in transit is a form of security interest under UCC Article 2 which terminates upon the buyer's obtaining lawful possession. Tennessee Code Annotated § 47–9–113; *see* Official Comment 1. Moreover, Oakland is faced again with the difficulty that reclamation under § 546(c) may be the exclusive remedy for recovery of the sold goods by an unpaid seller when the buyer files bankruptcy. *See e.g., In re MGS Marketing*, 111 B.R. 264, 267 (9th Cir. BAP 1990).

### REFORMATION

The relief of reformation is unnecessary because the Court has considered the parties' actual intentions in reaching its conclusion.

### CONCLUSION

From the above findings and conclusions, based on the pleadings, depositions, and affidavits on file, the Court concludes that Oakland did not possess a possessory or perfected security interest in the cotton and did not properly exercise its reclamation rights under § 546(c). Thus, as a matter of law, Oakland had no interest in the cotton at the time the bankruptcy petition was filed, and the cotton and its proceeds became property of the estate. The Trustee is entitled to summary judgment.

IT IS THEREFORE, ORDERED that:

1. Oakland will be and is allowed to amend its pleadings to plead reclamation as an alternative defense;

2. Oakland's prayer for reformation of the contracts is denied;

3. The Trustee's motion for summary judgment is granted and the proceeds from the cotton shall remain property of this estate; and

4. Oakland's motion for summary judgment is denied.

SO ORDERED.

---

shall, without unnecessary delay, deliver the agricultural products stored therein upon a demand made either by the holder of a receipt for such agricultural products or by the depositor thereof if such demand be accompanied with (a) an offer to satisfy the warehouseman's lien; (b) an offer to surrender the receipt, if negotiable, with such indorsements as would be necessary for the negotiation of the receipt; and (c) a readiness and willingness to sign, when the products are delivered, an acknowledgement that they have been delivered if such signature is requested by the warehouseman.